**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **CHARLES SMITH, JR.,** | § | |
| **TDCJ No. 02181823,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **V.** | § | **A-22-CV-153-RP** |
| | § | |
| **BOBBY LUMPKIN, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

## <u>ORDER</u>

Before the Court are Petitioner Charles Smith, Jr.'s pro se Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, Respondent Bobby Lumpkin's Answer (ECF No. 11), and Petitioner's Response (ECF No. 14). Having reviewed the record and pleadings submitted by the parties, the Court denies Petitioner's federal habeas corpus petition under the standards prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C. § 2254(d).

## I.  Background

In February 2017, Petitioner was charged by indictment with one count of burglary of a habitation. The indictment included two enhancement paragraphs: one for Petitioner's March 2000 conviction for theft in Travis County, and one for his November 1994 conviction for burglary of a building in Travis County. (ECF No. 12-23 at 6-7.) In February 2018, a jury convicted Petitioner of burglary of a habitation; after Petitioner pled true to the enhancement paragraphs, the trial court sentenced him to twenty-five years imprisonment. *State v. Smith*, No. D-1-DC-17-300235 (403rd Dist. Ct., Travis Cnty., Tex. Feb. 8, 2018). (ECF No. 12-23 at 8-9.)

1

The following is a summary of the factual background for Petitioner's conviction:

The jury heard evidence that five months after her husband of forty-one years passed away, Kathryn Smith went on a vacation with two of her three adult children, her stepdaughter and her son, and their families. Her stepson, [Petitioner], did not accompany them. Smith was gone for approximately one week, between Christmas and New Year's, and returned home on December 31st. Upon her arrival back home, she noticed that the outside security light was off. She entered her home through the back door, which leads to the carport, and immediately saw a trail of mud and rust through her dining room that had not been there before she left on her vacation. She checked the windows and doors and found that none were broken or unlocked. Nothing in the home had been disturbed; no items throughout the house appeared disturbed. However, Smith discovered that her fireproof safe, which she kept in her bedroom closet, was missing. The missing safe was black with a grey door and had a combination dial and a key lock. The contents of the safe included jewelry (Smith's and her late husband's), collectible coins and paper bills, personal and family documents (such as birth certificates and property deeds), and $16,000 cash. Smith called 911 to report the burglary. She later compiled a complete list of the contents of the stolen safe when making an insurance claim, valuing the items taken at approximately $559,000 collectively.

. . . .

Smith's stepdaughter, Kathleen Cook, arrived at Smith's house the night her stepmother discovered the burglary. Cook testified that she informed the police officers on the scene that she suspected that her brother, [Petitioner], had burglarized the home. At trial, she explained her reasons for suspecting her brother. She said that [Petitioner] feared that he was not going to get his share of the inheritance from their father. She described a conversation with [Petitioner] in which he had expressed his belief that their stepmother was hiding their father's will in the safe. Cook also explained that when [Petitioner] was a teenager, he would sneak in and out of the house by taking the hinges off of doors to remove the doors, including the carport door.

[Petitioner]'s cousin, Michelle Kershner Kenneally, also responded to Smith's house the night the burglary was discovered. She too suspected that [Petitioner] had committed the burglary, though she did not share her suspicions with the police. She testified that her suspicion was based on a "process of elimination" of those who knew about the safe—a few immediate family members—combined with her knowledge of [Petitioner]'s method of entering the house as a teenager by removing the carport door by taking off the hinges, which the police had concluded was the method of entry on this occasion.

To confirm (or dispel) their suspicions, Cook and Kenneally went to [Petitioner]'s property that night after the police left. As they drove by, they observed a vehicle at

the end of the driveway with several people trying to remove something from it. Kenneally described an "engine hoist" and a "large dark item." Cook described seeing a motor pulley next to the vehicle. Both women testified that they returned to the property on subsequent occasions and, on one occasion in February, they saw the safe, from a distance, on [Petitioner]'s property.

The police detective who conducted the follow-up investigation of the burglary of Smith's house testified at trial. He described the burglary as a "targeted burglary" based on the limited items taken, the method of entry, and how the crime was perpetrated. He explained that this burglary scene differed from a "typical burglary" in that there was no sign of forced entry, there was no evidence of ransacking (that is, no items in the home were displaced), and the usual type of items stolen in a residential burglary—valuable items that are easily removed and can be disposed of quickly, such as televisions, laptops, cell phones, and firearms—were not taken from Smith's home. Instead, only one item was taken, which, the detective explained, often suggests that the suspect is known to the resident.

The jury also heard the testimony of a pawn-shop employee and a pawn-shop owner who identified [Petitioner] as someone who had pawned various items in their stores. Their testimony established that [Petitioner] pawned numerous jewelry items and a collectible coin at these pawn shops shortly after the burglary of Smith's home. The descriptions on the pawn-shop forms of the items that [Petitioner] pawned matched descriptions of items that Smith reported as being in the stolen safe. A surveillance video at one of the pawn shops showed [Petitioner] pawning a diamond pendant. This pendant was recovered from the pawn shop by the burglary detective during his investigation. The detective met with Smith, who confirmed "without any hesitation" that the pendant belonged to her and was one of the jewelry items in the stolen safe. The pendant was returned to Smith.

*Smith v. State*, No. 03-18-00185-CR, 2019 WL 7342250 at *1-2 (Tex. App.—Austin, Dec. 31, 2019, pet. ref'd).

On direct appeal, Petitioner raised three points of error: first, the evidence introduced at trial was insufficient to support his conviction; second, the trial court erred in admitting his prior bad acts as a teenager; and third, the trial court erred in sentencing him as a habitual offender without providing the proper notice. The state court of appeals overruled these issues and affirmed Petitioner's conviction. *Id.* Petitioner thereafter filed a petition for discretionary review (PDR) with the Texas Court of Criminal Appeals (TCCA), focusing on his claim of insufficient evidence.

(ECF No. 12-21 at 1-12.) The TCCA refused Petitioner's PDR on June 17, 2020. *Smith v. State*, No. PD-0094-20 (Tex. Crim. App. June 17, 2020). Petitioner did not file a petition for writ of certiorari with the United States Supreme Court. (ECF No. 1 at 3.)

On June 6, 2021, Petitioner executed his state habeas corpus application, raising the following grounds for relief:

1.  The verdict was not supported by sufficient evidence;

2.  The trial court allowed in prior bad acts which prejudiced the jury;

3.  Petitioner was not properly notified in writing that he would be sentenced as a habitual offender; and

4.  Petitioner's trial counsel provided ineffective assistance of counsel when counsel
    a.  did not allow Petitioner to testify at trial;
    b.  failed to call Johnny Clemons as a witness;
    c.  failed to impeach Petitioner's sister with her prior lies to police about stolen cars;
    d.  did not cross-examine Petitioner's stepmother about a stolen laptop at her workplace or how she lied to the American consulate in Spain in order to get her mother a passport (so she could dodge a charge of intoxication manslaughter);
    e.  failed to hire an expert witness to prove his stepmother was lying about jewelry;
    f.  implied during his closing arguments that this stepmother had previously had a piece of jewelry in her possession, which was false;
    g.  failed to set up a polygraph for Petitioner; and
    h.  failed to hire an expert witness to disprove the picture of the safe.

(ECF No. 12-23 at 25 to 12-24 at 11.) On January 5, 2022, the TCCA denied Petitioner's state habeas application without written order on the findings of the trial court without hearing and on the court's independent review of the record. *Ex parte Smith*, No. WR-93,370-01 (Tex. Crim. App. Jan. 5, 2022).

Petitioner executed his federal habeas corpus petition on January 28, 2022, raising the following grounds for relief:

1.  The verdict is not support by sufficient evidence.

2. The trial court erred by permitting evidence of Petitioner's prior bad acts.

3. Petitioner was not properly notified in writing that he would be sentenced as a habitual offender.

4. Petitioner's trial counsel provided ineffective assistance when counsel
   a. failed to call Johnny Clemons as a witness;
   b. failed to properly cross-examine Petitioner's stepmother and sister about lying to the court for personal gain;
   c. did not allow Petitioner to testify at trial; and
   d. failure to object to and protect the hearsay argument.

(ECF No. 1.) Respondent Lumpkin answered the petition and Petitioner has filed a response. (ECF Nos. 11, 14.)

## II. Standard of Review

Petitioner's federal habeas petition is governed by the heightened standard of review provided by the AEDPA. *See* 28 U.S.C. § 2254. Under § 2254(d), a petitioner may not obtain federal habeas corpus relief on any claim that was adjudicated on the merits in state court proceedings unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005). This demanding standard stops just short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (citing *Felker v. Turpin*, 518 U.S. 651, 664 (1996)).

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, with a focus on whether the state court's application of clearly established federal law was "objectively unreasonable" and not whether it was incorrect or erroneous. *Wiggins v. Smith*,

539 U.S. 510, 520-21 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 409 (2000)). Even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Richter*, 562 U.S. at 102. A petitioner must show that the state court's decision was objectively unreasonable, which is a "substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (citation omitted). As a result, to obtain federal habeas relief on a claim previously adjudicated on the merits in state court, a petitioner must show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103; *see also Bobby v. Dixon*, 565 U.S. 23, 24 (2011). "'If this standard is difficult to meet—and it is—that is because it was meant to be.'" *Mejia v. Davis*, 906 F.3d 307, 314 (5th Cir. 2018) (quoting *Burt v. Titlow*, 571 U.S. 12, 20 (2013)).

### III. Analysis

#### 1. Sufficiency of the Evidence (claim 1)

In Petitioner's first claim, he argues the evidence admitted at trial is insufficient to support the verdict. Specifically, Petitioner alleges there was no proper lineup of the missing items from the safe and that the State never proved there was a burglary, the safe existed, or that Petitioner was involved in any way.

The standard for testing the sufficiency of evidence in a federal review of a state court conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence need not exclude every

reasonable hypothesis of innocence or be completely inconsistent with every conclusion except guilt so long as a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *United States v. Leahy*, 82 F.3d 624, 633 (5th Cir. 1996). The AEDPA further imposes a "twice-deferential standard" when a federal court reviews a state prisoner's claim challenging the sufficiency of the evidence. *Parker v. Matthews*, 567 U.S. 37, 43 (2012). The Supreme Court has explained it thusly:

> The opinion of the Court in *Jackson v. Virginia* . . . makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."

*Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (citing *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

In Petitioner's state habeas litigation, the TCCA denied this claim as non-cognizable. Accordingly, the Texas Third Court of Appeals has the last reasoned state court judgment for this claim. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.") In overruling this point of error, the Third Court of Appeals held as follows:

> The undisputed evidence at trial showed that someone entered Smith's home while she was away on vacation, without her permission or consent, and removed her fireproof safe and all its contents, which included jewelry, collectible coins and paper bills, personal and family documents, and $16,000 cash. In his sufficiency challenge, [Petitioner] disputes that the evidence demonstrated that he was the person who did so. He contends that there was "absolutely no evidence that [he] was in the home with the intent to commit theft" and asserts that the "tenuous" nature of the State's case, which, according to [Petitioner], was "full of disparate facts," provided only weak circumstantial evidence that did not provide proof beyond a reasonable doubt.

. . . .

The evidence in this case showed indications that the hinges on the carport door of Smith's house had been tampered with—pry marks on and next to the hinges, which were partially out. A reasonable inference from this evidence is that the pry marks were made when the burglar took the hinges off the carport door to remove the door to enter the home—particularly given the evidence showing that none of the other doors or windows were unlocked or broken. In fact, the evidence reflected that the police reached this conclusion after viewing the pry marks and signs of tampering on the carport door and excluding other possible entry points, such as the sliding glass door, which remained secured by a rod placed in the door. Testimony established that, as a teenager, [Petitioner] routinely entered the home after sneaking out by removing the carport door after taking the door's hinges off. The evidence also showed that the security light on the house—which was light sensitive, so it came on at dark and went off when it was light—was not on when Smith returned from her vacation. Testimony showed that [Petitioner] was the one who installed the security light at Smith's home and therefore knew how to turn it off.

In addition, the evidence established that the only item taken from the home was the safe (and its contents), which only a few immediate family members—including [Petitioner]—had knowledge of. The evidence also indicated that Smith's own dolly was used to move the safe out of the home. The jury could reasonably infer that [Petitioner], a family member who, the evidence showed, helped his father with maintenance-type repairs around the house, would have known that such transport was readily available on the scene. Additional evidence indicated that [Petitioner] had a motive for stealing the safe—his belief that it contained his father's will that his stepmother was hiding as well as valuable items that appellant believed were part of his inheritance, which he feared being deprived of. The limited nature of the theft supports the notion that, as explained by the burglary detective, this was a targeted burglary.

Further, the evidence showed that less than a week after Smith's house was burglarized, [Petitioner] pawned numerous items, including jewelry and a twenty-peso coin, that matched the descriptions of items that Smith reported being in the stolen safe. Testimony from the pawn-shop personnel who completed the pawn-shop forms when appellant pawned the items indicated that most of the pawned items—including the twenty-peso coin—were not recoverable as the metal had already been melted down. However, the burglary detective recovered one of the pawned jewelry items—a diamond pendant. The security surveillance video from that pawn shop shows [Petitioner] pawning that pendant. Smith recognized the pendant as one of the jewelry items that was in the stolen safe, and it was returned to her.

In addition, both [Petitioner]'s cousin and his sister testified that they saw the safe, albeit from a distance, on [Petitioner]'s property after the burglary. Kenneally took photographs on her phone, and those photographs, depicting what the women saw, were admitted into evidence for the jury to evaluate.

In sum, the circumstantial evidence in this case supported the inference that [Petitioner] entered into his stepmother's home through the carport door in the same manner that he did as a teenager when he lived in the home. In addition, the evidence demonstrating the removal of property from the home—that is, the theft of the safe and its contents—supported the inference that [Petitioner] entered the home with intent to commit theft or entered the home and committed theft. Evidence that appellant pawned items from the stolen safe—only days after the burglary—showed [Petitioner]'s possession of the stolen safe and items from it. *See Nisbett v. State*, 552 S.W.3d 244, 266 (Tex. Crim. App. 2018) (observing that circumstantial evidence can link defendant to commission of offense). In addition, the evidence demonstrated that [Petitioner] had a motive and the opportunity to perpetrate the burglary. *See id*. at 265 (noting that opportunity, when coupled with motive, is indicative of guilt).

. . . .

Based on the combined and cumulative force of the circumstantial evidence, along with the reasonable inferences drawn from it, we conclude that a rational trier of fact could have found beyond a reasonable doubt that [Petitioner] was the person who entered Smith's home without her consent and stole the safe and its contents. Therefore, we hold that the evidence is sufficient to support [Petitioner]'s conviction for burglary of a habitation. *See Nisbett*, 552 S.W.3d at 266–67. Accordingly, we overrule [Petitioner]'s first point of error.

*Smith*, 2019 WL 7342250 at *3-7.

Upon review, the Court concludes that the Third Court of Appeals rejection of Petitioner's sufficiency challenge was not objectively unreasonable. The evidence admitted at trial showed that Petitioner was one of only a few family members who knew about the safe; the entry into the house was consistent with how Petitioner used to take the carport door off its hinges as a teenager; Petitioner was worried about his inheritance and therefore had a motive to steal the safe; and a necklace Petitioner was seen pawning matched one his stepmother kept in the safe. Accordingly, this claim is denied.

2. Procedural Default (claims 2-3)

In Petitioner's second and third claims for relief, he argues the trial court erred when it allowed in evidence of his prior bad acts as a teenager, i.e., that he would take the hinges off the carport door to sneak out of the house at night, and that he was not properly notified in writing that he would be sentenced as a habitual offender. Respondent argues Petitioner has procedurally defaulted these claims. Respondent is correct.

Petitioner raised these claims in his direct appeal and in his state habeas application. The state court of appeals overruled these claims, concluding Petitioner failed to preserve the error by making a timely and specific objection. *Smith*, 2019 WL 7342250 at *8-10. During his state habeas proceedings, the habeas court made the following findings of fact and conclusions of law:

> 11. Error relating to the admissibility of evidence is generic, non-constitutional error; a claim raising this type of error is not cognizable at the post-conviction writ stage. *See Ex parte Graves*, 70 S.W.3d 103, 109 (Tex. Crim. App. 2002).

> 12. A failure to object at trial will generally preclude habeas review of a claim, just as it would on direct appeal. *Ex parte Crispen*, 777 S.W.2d 103, 105 (Tex. Crim. App. 1989).

> 13. Because it challenges the admissibility of evidence—a non-constitutional claim—[Petitioner]'s second ground for relief is not cognizable on habeas.

> 14. [Petitioner]'s second ground is also not cognizable on habeas because it was addressed on direct appeal.

> . . . .

> 18. [Petitioner]'s failure to object to his punishment range, his sentence, or to any lack of notice related thereto precludes habeas review of his third ground.

> 19. Even if the third ground were otherwise cognizable, [Petitioner] does not meet his burden of proof on his third ground, as the indictment's enhancement paragraphs constituted written notice of his punishment range, this court thoroughly admonished [Petitioner] about the potential consequences of the enhancement paragraphs, and [Petitioner] stated on the record that he understood his punishment range.

(ECF No. 12-24 at 44-45.)

"In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The "'Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims.'" *Styron v. Johnson*, 262 F.3d 438, 453-54 (5th Cir. 2001) (quoting *Jackson v. Johnson*, 194 F.3d 641, 652 (5th Cir. 1999)).

Because the state habeas court denied these claims based on Petitioner's failure to adequately object to them at trial, this Court will review them only if Petitioner establishes cause for the default and prejudice, or that failure to consider them will result in a fundamental miscarriage of justice. In his reply to Respondent's answer, Petitioner refers the Court to his state appellate brief for support but does not address either cause and prejudice for his default or the miscarriage of justice exception. Accordingly, Petitioner has failed to demonstrate cause for his default and actual prejudice and has not shown that failing to consider his claim will result in a fundamental miscarriage of justice. Petitioner's second and third claim for relief are therefore procedurally defaulted from federal habeas review.

3. Ineffective Assistance of Counsel (claim 4)

In Petitioner's final claim for relief, he argues his trial counsel, Mr. Charles Popper, provided ineffective assistance of counsel when Mr. Popper (a) failed to call Johnny Clemons as a witness, (b) failed to cross-examine Petitioner's stepmother and sister regarding their lies to the court for personal gain, (c) did not allow Petitioner to testify in his own defense, (d) failed to

11

properly object and preserve error regarding Petitioner's prior bad acts, and (e) made a statement implying Petitioner was guilty during closing argument. Respondent argues claims 4(a)-(c) and 4(e) are meritless, while claim 4(d) is unexhausted and therefore procedurally defaulted from federal habeas review.

The Sixth Amendment to the United States Constitution guarantees citizens the assistance of counsel in defending against criminal prosecutions. U.S. CONST. amend VI. Sixth Amendment claims based on ineffective assistance of counsel are reviewed under the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner cannot establish a violation of his Sixth Amendment right to counsel unless he demonstrates (1) counsel's performance was deficient and (2) this deficiency prejudiced petitioner's defense. *Id.* at 687-88, 690. The Supreme Court has emphasized that "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

When determining whether counsel performed deficiently, courts "must be highly deferential" to counsel's conduct and a petitioner must show that counsel's performance fell beyond the bounds of prevailing objective professional standards. *Strickland,* 466 U.S. at 687-89. Counsel is "'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Burt*, 571 U.S. at 22 (quoting *Strickland*, 466 U.S. at 690). To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Under this prong, the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). A habeas petitioner has the burden of proving both prongs of the *Strickland* test. *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Ineffective assistance of counsel claims are considered mixed questions of law and fact and are analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010). When the state court has adjudicated the claims on the merits, a federal court must review a petitioner's claims under the "'doubly deferential'" standards of both *Strickland* and Section 2254(d). *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)). In such cases, the "pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but whether "the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S at 101.

*4a: Failure to call witness*

Petitioner argues Mr. Popper provided ineffective assistance of counsel when he failed to call a witness, Johnny Clemons, to testify in Petitioner's defense. Petitioner alleges Mr. Clemons would have testified that Petitioner's brother asked Mr. Clemons if he knew how to open a safe.

Mr. Popper responded to these allegations in the state habeas proceeding as follows:

Johnny Clemons was a long-time friend of [Petitioner]'s brother and had known [Petitioner] for several decades. [Petitioner] stated to me that [Petitioner]'s family had believed that Mr. Clemons had previously stolen items from [] Kathryn Smith's house although no charges were ever filed. [Petitioner] believed that there was no burglary at all, as he thought that his step-mother had fabricated the break-in to get him locked up and sent away to prison. Thus, he did not think that Clemons was involved in any way. Given [Petitioner]'s belief that [Clemons] was not involved and the and the fact that it was extremely unlikely that [Clemons] would implicate himself on the stand because: 1) there was no other proof against [Clemons] and 2) [Clemons] would have faced a possibility of a habitual range of punishment on the stand were he to have testified, we felt that there was little chance of reasonable doubt being raised from the chance that the jury may believe [Clemons] had some involvement.

Mr. [Clemons] thought that [Petitioner]'s brother may have been involved in the burglary of his own residence due to a comment [Petitioner]'s brother made after the incident that implied that he had some extra money at that point. [Petitioner] and I discussed that trying to take a seemingly innocuous comment about having money, and then placing blame on the brother would be difficult since the brother

had been out of state on a winter vacation with the rest of his family at the time of the burglary. [Petitioner] and I discussed that although it was an alternative theory that Mr. [Clemons] could put forth, the value to be gained from trying to shift the blame to the brother who had an alibi of being out of state with his family along with a paucity of evidence to back up our claim at all would be far outweighed by all of the drawbacks that would have invariably come from [Clemons] testifying.

[Petitioner] and I also discussed that Mr. Clemons had a terrible record that included a state jail drug sentence, two different prison sentences for unauthorized use of a motor vehicle, prison for burglary, forgery and burglary of a building. [Petitioner] and I discussed the fact that not only would Mr. Clemons' priors be admissible as impeachment evidence against Mr. [Clemons], but they may likely reflect poorly on [Petitioner] as [Petitioner] and Mr. Clemons had been friends and associates such a long time.

Ultimately, it came down to strategy that [Petitioner] and I decided the potential value of Mr. Clemon's testimony would be outweighed by the damage his past could bring making it appear that [Petitioner] associated with a person who had been convicted of numerous felonies. [Petitioner] and I discussed that we felt we had a better chance of winning in trial without Clemons on the stand and that his (Clemons') testimony along with credibility issues could have had a detrimental impact on our case. The decision to not call Clemons was made jointly by my client, [Petitioner], and me.

(ECF No. 12-24 at 54-55.) In recommending denial of this claim, the state habeas court made the following findings of fact:

43. [Petitioner] states that Johnny Clemons had made a statement and showed up to court to testify.

44. [Petitioner] does not state in his application what he believes Clemons would have offered on the stand; in a letter to the court, he states Clemons would testify that [Petitioner]'s brother asked Clemons "Do you know how to get into a safe?"

45. Attorney Popper describes Clemons as a longtime acquaintance of [Petitioner] and longtime friend of [Petitioner]'s brother.

46. Attorney Popper believes [Petitioner] hoped Clemons would testify either that [Petitioner]'s brother had committed the burglary or that no burglary occurred.

47. Attorney Popper describes that both of these lines of testimony were unlikely to be credible or compelling to the jury.

48. Attorney Popper notes that Clemons had an extensive criminal record, including burglary of a habitation, burglary of a building, forgery, unauthorized use of a motor vehicle, and possession of controlled substance, amounting to seven penitentiary sentences and one state jail sentence.

49. Attorney Popper states that Clemons's prior history would have been admissible as impeachment evidence against Clemons himself, but might also have reflected poorly upon [Petitioner], as the two had been associates for a long time.

50. Attorney Popper states that he jointly made the strategic decision with [Petitioner] not to call Clemons as a witness due to the risk of impeachment outweighing any value his testimony might offer.

51. Attorney Popper's decision not to call Clemons as a defense witness was reasonable and strategic.

(ECF No. 12-24 at 39-40.)

*Strickland* requires counsel to undertake a reasonable investigation. 466 U.S. at 690-91; *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013). Counsel must, at minimum, interview potential witnesses and make an independent investigation of the facts and circumstances of the case. *Kately v. Cain*, 704 F.3d 356, 361 (5th Cir. 2013). In assessing the reasonableness of counsel's investigation, a heavy measure of deference is applied to counsel's judgments and is weighed in light of the defendant's own statements and actions. *Strickland*, 466 U.S. at 691. To prevail on an ineffective-assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate the witness was available to testify, delineate the content of the witness's proposed testimony, and show the testimony would have been favorable to the defense. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

The state habeas court found that, together, Petitioner and Mr. Popper made the reasonable, strategic decision not to call Mr. Clemons as a witness, concluding that any value from Mr. Clemons's testimony was outweighed by the risk his past criminal convictions would reflect poorly on Petitioner. Petitioner fails to rebut these findings and show that Mr. Clemons's

15

testimony would have been favorable to the defense. Accordingly, the state habeas court's application of *Strickland* to this claim was not objectively unreasonable and it is denied.

*4b. Failure to properly cross-examine witnesses*

Petitioner next claims Mr. Popper provided ineffective assistance of counsel when he failed to cross-examine his stepmother and sister with Petitioner's allegations of their prior bad acts. Mr. Popper responded to this claim as follows:

> The first witness that [Petitioner] brought up was Kathleen Cook, his sister. [Petitioner] made an allegation that she hired someone to drive her car to Mexico 15 or 20 years ago and leave it there in order to file a false insurance claim. His sister was never charged and he had no evidence of this wrong act. [Petitioner] did not have any specific details regarding when this incident occurred, what insurance company was involved, or the identity of the person who drove the car to Mexico. It was a question of trial strategy that we did not question her on these grounds since the witness was never charged nor did we possess any specifics or evidence to show she committed this act. It was our decision that exploration of this allegation with no evidence to back it up in cross was unlikely to meaningfully contribute to the defense theory of the case especially because the allegation was so old and possibly stale.

> The second witness that [Petitioner] brought up was the victim, Kathryn Smith, his stepmother. [Petitioner] wanted to question her regarding a stolen laptop that he alleged that she had at her workplace. We were unable to uncover charges brought against his step-mom for having a stolen laptop. [Petitioner] had no evidence describing the laptop nor anything in regards to whom it was stolen from or when it was stolen. [Petitioner]'s step-mom was considered the victim in this case and had seemingly come across sympathetically to the jury to that point in trial. It was a decision of trial strategy that bringing up an allegation with no proof at all would likely be detrimental to the defense while having a miniscule chance of providing any value to the defense.

> [Petitioner] also had issue with not questioning his step-mom over his allegation that she had lied several decades ago to the Spanish Consulate in order to secure her mother's passport for dodging a charge of intoxication manslaughter involving a family of four in Spain. There was no evidence of this allegation in the discovery turned over by the District Attorney's office. [Petitioner] had no evidence nor information to support this claim in regards to either his stepmother's lies to the U.S. immigration authorities or his step-grandmother's act of killing four people. I spent about two hours making phone calls to authorities and checking online for any trace of evidence to back up [Petitioner]'s allegation, but I could not find any

evidence that the witness' mother had been charged in Spain for any crime regarding killing four people or even that this event had happened. It was a matter of trial strategy that we did not cross-examine the victim on an act that supposedly took place decades ago, where no one was charged and there was not any evidence of an investigation into these acts at the time that supposedly were committed. In addition, I felt that this line of cross would also be unlikely to add to the defense or to any defensive theories.

(ECF No. 12-24 at 54-55.) The state habeas court found the following:

> 52. [Petitioner] argues Attorney Popper was ineffective for failing to cross-examine two State's witnesses on specific allegations of dishonesty.

> 53. [Petitioner] alleges his sister falsely reported to law enforcement that her car had been stolen so that she could file a fraudulent insurance claim.

> 54. [Petitioner] alleges his stepmother (the victim of the charged burglary) possessed a stolen laptop at work and lied in regards to a passport application for her mother.

> 55. [Petitioner] does not provide the court with any evidence to substantiate these allegations against his sister and his stepmother.

> 56. Attorney Popper attempted to investigate [Petitioner]'s claims against his sister and his stepmother but was unable to locate any evidence that corroborated or supported [Petitioner]'s allegations.

> 57. As to the sister, Attorney Popper explains that [Petitioner]'s allegations originated from at least fifteen to twenty years prior to trial, and Attorney Popper was unable to locate any records to establish the sister was charged with any offense in relation to these claims.

> 58. As to the stepmother, Attorney Popper investigated and was unable to locate any indication that charges had ever been filed regarding a stolen laptop.

> 59. Likewise, Attorney Popper investigated and was unable to locate any evidence to support [Petitioner]'s allegations that his stepmother falsified information on a passport application.

> 60. Attorney Popper decided not to raise any of [Petitioner]'s allegations against his sister and stepmother because he was reluctant to make accusations against the witnesses without any proof of wrongdoing by either witness.

61. Attorney Popper determined that bringing unsupported allegations against the witnesses posed a risk of damaging the credibility of the defense and provided only a miniscule chance of adding value to any defensive theories.

62. Attorney Popper noted that the stepmother, in particular, presented as sympathetic before the jury during her direct examination, and he did not want to alienate the jury by attacking her with unsubstantiated allegations of wrongdoing.

(*Id.* at 40-41.)

"[C]ounsel has wide latitude in deciding how best to represent a client," *Yarborough v. Gentry*, 540 U.S. 1, 5-6, 8 (2003), and counsel's choice of a defense and his strategy in arguing that defense to a jury are "virtually unchallengeable," *Strickland*, 466 U.S. at 690. Further, because decisions regarding cross-examination are strategic, they usually "will not support an ineffective assistance claim." *United States v. Bernard*, 762 F.3d 467, 472 (5th Cir. 2014) (citation omitted). As a result, so long as counsel's trial strategy was reasonable, "[s]peculating about the effect of tinkering with the cross-examination questions is exactly the sort of hindsight that *Strickland* warns against." *Castillo v. Stephens*, 640 F. App'x 283, 292 (5th Cir. 2016) (citing *Strickland*, 466 U.S. at 689). The state habeas court concluded that there was no evidence supporting Petitioner's allegations against his stepmother and sister, and Petitioner fails to rebut these findings with clear and convincing evidence in his federal habeas petition and reply. 28 U.S.C. § 2254(e)(1). As a result, the Court concludes the state habeas court's application of *Strickland* to this claim was not objectively unreasonable, and it is denied.

*4c: Not allowing Petitioner to testify at trial*

Petitioner next argues Mr. Popper provided ineffective assistance when he refused to allow Petitioner to testify in his own defense at trial. Petitioner alleges he told Mr. Popper that if he didn't testify, the jury would think he had done something wrong and conclude he was guilty. Mr. Popper addressed these allegations in his state habeas affidavit:

18

I had long discussions with my client prior to the trial as to whether he should testify or not. I was very clear with him that it was his decision to make ultimately. We discussed the merits and possible pitfalls of a defendant testifying in his own defense in a case. I especially touched on the danger of a person testifying who is charged as a habitual offender and who has numerous convictions for felony theft-related charges as [Petitioner]'s record reflected. [Petitioner] decided prior to trial to not testify deciding that the value of his testimony would likely be far outweighed by the prejudice he may bring to his own case through the state's impeachment of his testimony. During the trial, at the end of the state's case, [Petitioner] and I again discussed the possibility of him testifying. [Petitioner] came to the same decision at that point that his best chance of winning the case laid in him remaining silent. He chose again not to testify.

(ECF No. 12-24 at 53.) The state habeas court found the following:

34. Attorney Popper states that he had several long discussions with [Petitioner] prior to trial about whether [Petitioner] should testify.

35. Attorney Popper states he was very clear with [Petitioner] that the decision whether to testify was ultimately [Petitioner]'s decision.

36. Attorney Popper states that he discussed with [Petitioner] the merits and potential pitfalls of testifying, and that he specifically warned [Petitioner] about the danger of being impeached by his criminal history including felony theft convictions.

37. Attorney Popper states that [Petitioner] decided, prior to trial, that he would not take the stand as the risk of impeachment outweighed the potential benefit of his testimony.

38. Attorney Popper states that, at the conclusion of the State's case, he again discussed the decision whether to testify with [Petitioner], and [Petitioner] again decided to exercise his right to remain silent.

39. [Petitioner] states that Attorney Popper did not allow him to testify and that he did not agree with Attorney Popper's advice that [Petitioner] should not testify.

40. [Petitioner] does not offer any information about how he would have testified, had he taken the stand.

41. The court does not find [Petitioner]'s statement that Attorney Popper did not allow him to testify to be credible.

42. Attorney Popper gave [Petitioner] reasonable, professional advice about the risks of testifying, and he did not prevent [Petitioner] from testifying.

(ECF No. 12-24 at 38-39.)

Petitioner argues he wanted to testify about Johnny Clemons's story and about his allegations regarding his stepmother and sister. (ECF No. 14 at 4-5.) However, the state habeas court credited Mr. Popper's affidavit stating he and Petitioner decided against calling Mr. Clemons as a witness. The state habeas court further concluded there was no evidence supporting Petitioner's allegations against his stepmother and sister. Finally, the state habeas court did not find Petitioner's claim that Mr. Popper would not allow him to testify credible. Petitioner has failed to offer any additional clear and convincing evidence to rebut these findings; further, conclusory allegations are insufficient to raise a cognizable claim of ineffective assistance of counsel. *See United States v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007). The Court therefore concludes the state court's application of *Strickland* to this claim was not unreasonable, and it is denied.

### 4d: Failure to preserve error

Petitioner next claims Mr. Popper provided ineffective assistance of counsel when he failed "to protect hearsay argument" at trial. In his reply, Petitioner elaborates that this relates to counsel's failure to object to hearsay testimony about him removing the hinges from the carport door when he was a teenager, and therefore preserving this issue for appeal. (ECF No. 14 at 4.) Respondent argues that, because Petitioner failed to exhaust this claim in the state courts, it is procedurally barred from federal review.

Before seeking review in federal court, a petitioner must first present his claims in state court and exhaust all available state court remedies through an adjudication on the merits. *See* 28 U.S.C. § 2254(b)(1)(A). The AEDPA exhaustion requirement is satisfied if the substance of the federal habeas claim was presented to the highest state court in a procedurally proper manner.

*Baldwin v. Reese*, 541 U.S. 27, 29-32 (2004); *Moore v. Cain*, 298 F.3d 361, 364 (5th Cir. 2002). In Texas, the exhaustion requirement is satisfied if the substance of the claim was presented to the TCCA in a procedurally proper manner either through a PDR or through an application for writ of habeas corpus. *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).

When a petitioner "fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,'" a petitioner's claim is procedurally defaulted from federal habeas review. *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). The only way for a petitioner to overcome a procedural default is to show cause for the default and resulting prejudice, or to demonstrate that the federal court's failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750-51 (1991); *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004).

Petitioner did not raise this claim in either his PDR or in his state habeas application. Should this Court now require Petitioner to return to state court to satisfy the exhaustion requirement, the TCCA would find the claims procedurally barred under the abuse of the writ doctrine found in Article 11.07 § 4 of the Texas Code of Criminal Procedure. Under that doctrine, the state habeas court would not consider the merits of Petitioner's second state habeas application unless Petitioner could show either the legal or factual basis of his current claims was not available when he filed his prior state habeas application, or that, but for a violation of the U.S. Constitution, no rational juror could have found Petitioner guilty beyond a reasonable doubt. TEX. CODE CRIM. PROC. ANN. art. 11.07(4)(a)(1), (2).

Respondent raised this argument in his answer, but Petitioner failed to respond to it in his response. He therefore has not shown that his second state habeas application would not be

dismissed as an abuse of the writ and this Court's independent review of Petitioner's claim does not suggest it falls under either of the exceptions. Petitioner also fails to overcome the procedural default by showing that cause and prejudice should excuse his default or that the Court's failure to consider his claims will result in a fundamental miscarriage of justice. As a result, this claim is procedurally defaulted from federal habeas review.

*4e: Prejudicial closing argument*

In Petitioner's final claim for habeas relief, he argues Mr. Popper provided ineffective assistance when Mr. Popper said during closing argument that the detectives "gave back" the diamond pendent to his stepmother, which Petitioner argues implies the pendent was hers and that he was guilty. The state habeas court made the following findings of fact:

> 72. [Petitioner] argues that Attorney Popper was ineffective for stating that the police "gave back" the jewelry to [Petitioner]'s stepmother, implying that specific piece of jewelry did, in fact, belong to her. [Petitioner] argues that this was inaccurate and undermined the defense.
>
> 73. In closing, Attorney Popper stated the following in reference to a pendant that [Petitioner] had sold but that police had the shop owner give to them:
>
>> I mean, he had assumed he was giving it to APD because they had accurately identified it. He assumed they had either pictures or some sort of list of the majority. He said that that's what APD does. That they're supposed to bring some sort of list and know what they're looking for. They just looked for what [Petitioner] pawned and gave it back to her without even knowing that she was the rightful owner. She -- both Kathleen and Kathryn said on the stand that they could not positively identify them.
>
> 74. Attorney Popper's statement was drawing attention to a lack of investigation into whether the stepmother was the rightful owner of the jewelry, which was in line with defensive theories. The phrase, "gave it back to her" does not convey what the [Petitioner] asserts it does, nor did it undermine the defense.

(ECF No. 12-24 at 42-43.)

Trial counsel has broad discretion when it comes to deciding how best to proceed strategically. *See Ward v. Stephens*, 777 F.3d 250, 264 (5th Cir. 2015) (the Supreme Court has emphasized counsel has "wide latitude in deciding how best to represent a client"). On federal habeas review, the Court is mindful that "*Strickland* does not allow second guessing of trial strategy and must be applied with keen awareness that this is an after-the-fact inquiry." *Granados v. Quarterman*, 455 F.3d 529, 534 (5th Cir. 2006). In other words, simply because counsel's strategy was not successful does not mean counsel's performance was deficient. *Avila v. Quarterman*, 560 F.3d 299, 314 (5th Cir. 2009). The state habeas court found that Mr. Popper's statement during closing argument did not implicate Petitioner's guilt, and Petitioner has failed to rebut this finding with clear and convincing evidence. Further, Petitioner has failed to show that Mr. Popper's statement was deficient performance or that it prejudiced Petitioner. Accordingly, the state court's application of *Strickland* to this claim was not unreasonable and it is denied.

### IV. Certificate of Appealability

A petitioner may not appeal a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. *See Miller-El v. Cockrell,* 537 U.S. 322, 335-36 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). In cases where a district court rejects a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When a district court rejects a habeas petition on

procedural grounds without reaching the constitutional claims, "a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the dismissal or denial of the Petitioner's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El*, 537 U.S. at 327 (citing *Slack*, 529 U.S. at 484). Accordingly, the Court denies a certificate of appealability.

It is therefore **ORDERED** that Petitioner's Petition for Writ of *Habeas Corpus* is **DENIED**.

It is finally **ORDERED** that a certificate of appealability is **DENIED**.

SIGNED this 12th day of May, 2023.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE